NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0114n.06

No. 22-3233

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DOCTOR LORA FREIER-HECKLER, | ) | **FILED** |
| Plaintiff-Appellant, | ) | Mar 07, 2023 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| DENIS RICHARD MCDONOUGH, Secretary, Department of Veteran Affairs; VA MEDICAL CENTER OF CLEVELAND, | ) ) ) ) ) | OPINION |
| Defendants-Appellees. | ) ) | |

Before: MOORE, STRANCH, and MURPHY, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Dr. Lora Freier-Heckler, a Veterans Administration employee, brings this Title VII hostile work environment and retaliation case against her employer. Because the Plaintiff cannot establish either a hostile work environment or retaliation claim, we **AFFIRM** the district court's decision granting summary judgment to Defendants.

## I.  BACKGROUND

Dr. Freier-Heckler began working at the VA's Cleveland Medical Center in 1990. She was promoted in 2014 to Assistant Chief of the Logistics Service, where she reported to Philip Rutledge, the Chief of the Logistics Service. Dr. Freier-Heckler testified that Rutledge conducted the interviews for the Assistant Chief position and was not only on a panel that hired her, but was the ultimate decision-maker who selected her. In August 2015, she assumed the position of Assistant Chief of Logistics and began reporting to Rutledge. The parties agree that over the

No. 22-3233, *Freier-Heckler v. McDonough*

course of her 5-year tenure in that position, Dr. Freier-Heckler met with VA personnel over 180 times to discuss her complaints about Rutledge, and that she filed 87 complaints with the VA Director and Deputy Director and several complaints with the Human Resources Department.

In June 2020, Dr. Freier-Heckler filed the operative complaint against the VA Medical Center of Cleveland and the Secretary of the Department of Veteran Affairs. The complaint alleges that Rutledge discriminated against Dr. Freier-Heckler based on her gender and created a hostile work environment, that the VA failed to take any action to address Rutledge's discrimination, and that the VA retaliated against her when she complained about this discrimination. The district court granted the Defendants' motion for summary judgment on all claims. Dr. Freier-Heckler appeals the grant of summary judgment only as to her hostile work environment and retaliation claims. She points to the following series of incidents as the basis for her Title VII claims. We construe these facts in the light most favorable to the plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

First, Dr. Freier-Heckler points to a draft organizational chart that Rutledge created but never implemented that would have removed the Assistant Chief position from the managerial structure. She relies on evidence that Rutledge moved her office to a management suite located 30 feet from where her subordinates sat. She also notes that on January 3, 2017, Rutledge removed her access to his daily calendar while allowing male employees to retain access, and on January 5, Rutledge told her to stop talking and dismissed her from a meeting, but allowed male subordinates and other employees to stay. Dr. Freier-Heckler argues that Rutledge restricted her calendar access and dismissed her from the meeting in retaliation for complaints that employee Kenneth Smith made to VA officials about Rutledge's treatment of her.

No. 22-3233, *Freier-Heckler v. McDonough*

Dr. Freier-Heckler argues that the VA's EEO process concluded and the VA's Deputy Director, Andy Pacyna, acknowledged, that Rutledge created a "borderline hostile work environment." She points to an email that she sent herself in which she wrote "Dir stated that is [sic] was border line Hostile," alleging that the email memorializes a meeting with VA management. She also points to Rutledge's statement that he was familiar with the phrase "borderline hostile work environment."

Dr. Freier-Heckler testified to one occasion on which Rutledge asked her to watch his ten-year-old son for the afternoon. She additionally charges that Rutledge intentionally mispronounced her name and refused to call her "Doctor" after she received her Doctorate in Health Administration, although he used that title for at least two male supervisors who had doctorates. She claims that in April 2017, Pacyna told Rutledge to apologize for not calling her "Doctor," and that he refused to do so. Rutledge acknowledged that he may have been told to apologize for a comment related to this issue and that he did not. And finally, in an incident that Dr. Freier-Heckler did not reference in discovery or other proceedings in this case, in her opposition to Defendants' motion for summary judgment, she alleges that Rutledge humiliated her by shooting a rubber band at her in front of her co-workers, striking her "on the left part of [her] posterior."

Relevant to Dr. Freier-Heckler's retaliation claim, record evidence shows that the VA asked her to lead multiple audits while she served as Assistant Chief. First, in 2016, she was assigned to audit VA employee Bill Precht, who reported to Rutledge, and uncovered that Precht made over $7,000,000 in unlawful purchases. Later in 2017, Dr. Freier-Heckler was asked to lead a second audit, this time of the Logistics Services' Transportation Section, during which she

No. 22-3233, *Freier-Heckler v. McDonough*

discovered serious anomalies attributable to Chavtz Seals, who also reported to Rutledge. Seals was removed for cause from his position and demoted multiple levels as a result.

The record also reflects that in 2018, the VA convened an Administrative Investigative Board ("AIB") to investigate allegations that Dr. Freier-Heckler created a "hostile work environment by engaging in bullying, threatening, and other unprofessional behaviors." The AIB was comprised of three individuals that Dr. Freier-Heckler did not know, and it considered over 50 exhibits, including testimony from 21 different employees. The final AIB report recommended that Dr. Freier-Heckler no longer hold a managerial position, concluding that she engaged in workplace bullying and did not exhibit the qualities a supervisory position required. The AIB reported that "[a]lmost every witness" testified that Dr. Freier-Heckler made frequent negative comments to subordinates about other management officials. It also credited testimony that Dr. Freier-Heckler yelled at employee Chavtz Seals and used profanities during a meeting; reports from additional witnesses that Dr. Freier-Heckler yelled at Seals on a separate occasion; and another employee's allegation, corroborated by witnesses, that Dr. Freier-Heckler yelled at the employee and used profanities.

The VA demoted Dr. Freier-Heckler to a non-supervisory position in 2019. Six months later, she applied and was hired for another non-supervisory position at the same GS salary level as her former Assistant Chief role. The record establishes that Dr. Freier-Heckler's demotion resulted in lost wages of less than $1,000.

## II.   STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo. *Gillis v. Miller,* 845 F.3d 677, 683 (6th Cir. 2017). A movant is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

No. 22-3233, *Freier-Heckler v. McDonough*

matter of law." Fed. R. Civ. P. 56(a). The court should grant summary judgment when the evidence raises no genuine issues of material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)). Once the moving party establishes that there is no genuine dispute of material fact, the burden shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Id.* at 324.

### III.   ANALYSIS

####   1.   Hostile Work Environment

Title VII prohibits an employer from maintaining a hostile work environment due to sexual harassment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). A successful hostile work environment claim under Title VII requires a plaintiff to establish that (1) "she is a member of a protected class," (2) she was subjected to harassment based on sex, (3) "the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile, or offensive work environment;" and (4) there is "some basis for liability on the part of the employer." *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008). The VA does not dispute that the first and fourth prongs of the test are met. The remaining questions from the second and third prongs are whether Dr. Freier-Heckler was subjected to harassment based on sex, and whether the harassment unreasonably interfered with her work and created an objectively hostile work environment.

To establish that harassment created a hostile work environment, a plaintiff must show that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is

No. 22-3233, *Freier-Heckler v. McDonough*

'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris*, 510 U.S. at 21 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)). Because the discriminatory intimidation alleged must be severe and pervasive, "isolated incidents" of discrimination "will not amount to discriminatory changes in the 'terms and conditions of employment'" unless they are "extremely serious." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Acknowledging that this is not "a mathematically precise test," the Supreme Court has provided a non-exhaustive list of factors to consider, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S at 23. Abusive behavior needs to be objectively hostile to be actionable, and a court must consider the totality of the circumstances when determining whether an environment is hostile. *Id.* at 21; *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). Under the totality of the circumstances test, "the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Johnson v. Ford Motor Co.*, 13 F.4th 493, 505 (6th Cir. 2021) (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999)); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").

No. 22-3233, *Freier-Heckler v. McDonough*

In sum, on appeal, Dr. Freier-Heckler claims that:

- Rutledge moved her office to a management suite;

- Rutledge had an employee create, but did not implement, a separate organizational chart in which her position did not have direct reports;

- Rutledge removed her from access to his daily calendar but allowed male employees to retain access;

- Rutledge once dismissed her from a meeting but allowed male employees to stay;

- Dr. Freier-Heckler was assigned by the VA to audit employee Bill Precht;

- The VA's EEO process concluded that Rutledge's actions were "borderline hostile environment";

- Rutledge once asked her to babysit his son;

- Rutledge mispronounced her name and neglected to call her "Doctor" after she received her doctorate, although he used the title for male supervisors who had doctorates;

- The VA's Deputy Director instructed Rutledge to apologize and that he refused to do so; and

- Rutledge once shot a rubber-band at her, hitting her in the posterior.

"Any unequal treatment of an employee that would not occur but for the employee's gender" may be considered in the hostile environment analysis. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (quoting *Williams*, 187 F.3d at 565). But Title VII is directed only at gender discrimination and "does not prohibit all verbal or physical harassment in the workplace." *Id.* (quoting *Oncale*, 523 U.S. at 80). Facially neutral incidents may be considered in the hostile work environment analysis "when there is 'some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory.'" *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 815 (6th Cir. 2013) (quoting *Alfano v. Costello,* 294 F.3d 365, 378 (2d Cir. 2002)). Therefore, we require some basis to infer that the incidents that

No. 22-3233, *Freier-Heckler v. McDonough*

Dr. Freier-Heckler points to were based on her gender to include them in the gender-based hostile work environment analysis. *See Bowman*, 220 F.3d at 464.

Dr. Freier-Heckler first argues that the proposed organizational chart constituted an effort to "isolate her out of the chain of command." She does not dispute, however, that it was never implemented and points to no evidence that it was motivated by her gender or had any impact on her responsibilities or ability to do her work. Nor does she point to evidence that Rutledge moved her office because of her gender. Rutledge testified—and Dr. Freier-Heckler does not contest—that after the department expanded, he moved Dr. Freier-Heckler to the office next to his own, in a management suite. And the record does not show that she was denied access to her subordinates, as her location in the management suite was only 30 feet away from her reports.

Dr. Freier-Heckler also points to no evidence indicating that the removal of her access to Rutledge's daily calendar was based on her gender. There was no requirement that access be shared, other supervisors did not have access, and the only male employees who retained access were administrative employees responsible for making calendar appointments. She similarly points to no evidence establishing that Rutledge asked her to stop talking and leave the January 5, 2017, meeting based on her gender. Though Dr. Freier-Heckler argues that Rutledge intentionally mispronounced her name, she does not contest that Rutledge grew up in Germany and used the German pronunciation, and does not point to any evidence that might show that he mispronounced her name because of her gender.

Regarding her claim that the VA's EEO process concluded that Rutledge's behavior created a "borderline hostile environment," Dr. Freier-Heckler points to no evidence indicating that the VA made a formal or memorialized finding that his conduct constituted a hostile work environment. Besides her own email, she points only to Rutledge's statement that he was familiar

No. 22-3233, *Freier-Heckler v. McDonough*

with the phrase "borderline hostile work environment." And though his testimony related to fact-finding concerning allegations by Dr. Freier-Heckler, it was made during an investigation that did not involve the EEO investigator here. Instead, the record shows that an independent investigation of Dr. Freier-Heckler's complaint concluded that it did not constitute a hostile work environment. And to the extent Dr. Freier-Heckler argues Pacyna admitted that Rutledge engaged in "'borderline' hostile work environment behavior," that argument is precluded by her allegation in the complaint that "Assistant Director Pacyna . . . concluded that Rutledge's actions were, in his view, not found by him to be borderline hostile."

Finally, in support of her hostile work environment claim, Dr. Freier-Heckler seems to imply that Rutledge was retaliating against her for auditing his colleague Bill Precht and discovering improper purchases he made. But she does not attempt to connect this with her gender in any way. Dr. Freier-Heckler's audit activities, moreover, were supported by VA management, and she continued to be assigned to lead or perform important audit work.

In contrast, Dr. Freier-Heckler describes three incidents that are more plausibly based on her gender: that Rutledge once asked her to babysit, that he failed to use her proper title, and that he once hit her posterior with a rubber band. Rutledge admits that he asked Dr. Freier-Heckler to babysit on one occasion but maintains that he did so because he considered her a friend, although she argues that the two were not friendly. This could give rise to a reasonable inference that Rutledge's request was based on gendered stereotypes of women as caregivers, and that he would not have made the request if she were a man. But Dr. Freier-Heckler does not allege that the request impacted her ability to do her job, that she was afraid to refuse the request, or that Rutledge made any explicit or implicit threats if she did not agree.

No. 22-3233, *Freier-Heckler v. McDonough*

The single incident with the rubber band was clearly inappropriate and unwanted contact with a sensitive area, which a reasonable factfinder could find constituted sexual harassment. There is, however, an evidentiary problem with this incident. Dr. Freier-Heckler described this incident for the first time in affidavits from herself and a coworker witness that were attached to her opposition to Defendants' motion for summary judgment. She did not include the rubber band incident in her complaint, and she never mentioned it in her deposition testimony, despite being repeatedly asked to describe every incident supporting her hostile work environment claim. Because "a party should not be able to create a disputed issue of material fact where earlier testimony on that issue by the same party indicates that no such dispute exists," the court could disregard this incident. *Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 907 (6th Cir. 2006). And because the babysitting request occurred only once in the relevant five-year span, it may be considered an infrequent "isolated incident" that did not rise to the level of an actionable hostile work environment. *Faragher*, 524 U.S. at 788.

Finally, Rutledge's failure to call Dr. Freier-Heckler "Doctor" after she obtained her doctorate, despite using that title for male supervisors with doctorates, could reasonably be found to be conduct that was based on her gender and rooted in stereotypes of women as less-competent professionals. Rutledge's admission that Pacyna may have asked him to apologize for a comment related to Dr. Freier-Heckler's title also lends some support to the argument that his failure to use her title was inappropriate. Although Rutledge failed to call Dr. Freier-Heckler "Doctor," this conduct is likewise insufficiently severe, even in combination with the other incidents, to amount to conduct that alters the terms or conditions of her employment.

Dr. Freier-Heckler also argues that the district court improperly disaggregated her claims and did not consider all her allegations together. She is correct that a court must consider all the

No. 22-3233, *Freier-Heckler v. McDonough*

circumstances when determining whether an actionable hostile work environment claim exists and may not "rob[] [a plaintiff's claims] of their cumulative effect" by disaggregating them. *Williams*, 187 F.3d at 561; *see Morgan*, 536 U.S. at 115. But the opinion below shows that the district court considered the combined effect of each incident alleged. For instance, the court framed its analysis by acknowledging that a plaintiff may prove a hostile work environment claim "[w]hen individual acts do not independently rise to the level of an actionable 'adverse action,' but combine together to create harassment and intimidation." The court then described the incidents individually, found that Dr. Freier-Heckler failed to show that any alleged incident was motivated by her gender, and concluded that the "actions, comments, and situations that she found subjectively offensive and demoralizing" were insufficient to create a gender-based hostile work environment. This satisfies the totality of the circumstances inquiry that Title VII requires. *Morgan*, 536 U.S. at 116.

Considering the totality of the record, the conduct here does not rise to the level that our circuit has treated as sufficiently severe and pervasive that it creates a hostile work environment. *See Williams*, 187 F.3d at 563-64 (hostile work environment claim survived summary judgment where plaintiff's supervisor targeted her with humiliating sexual innuendo and her co-workers repeatedly used gendered insults and sabotaged her work); *Wyatt v. Nissan N. Am., Inc.,* 999 F.3d 400, 411 (6th Cir. 2021) (hostile work environment claim survived summary judgment where a plaintiff's supervisor subjected her to persistent unwanted touching and a sexual proposition); *Waldo*, 726 F.3d at 815 (district court did not abuse discretion in finding hostile work environment existed where plaintiff's coworkers used gender-specific demeaning language, denied her access to a bathroom, and kept sexually explicit magazines in work trucks). On the record submitted, Dr. Freier-Heckler has failed to establish that she was subject to conduct that was "sufficiently severe

-11-

No. 22-3233, *Freier-Heckler v. McDonough*

or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (quoting *Meritor Sav. Bank, FSB*, 477 U.S. at 67).

### 2.     Retaliation Claim

Dr. Freier-Heckler also argues that the VA retaliated against her for her gender discrimination complaints. Title VII prohibits retaliation against employees for engaging in conduct protected by Title VII. *Laster v. City of Kalamazoo*, 746 F.3d 714, 729 (6th Cir. 2014). Because Dr. Freier-Heckler does not point to direct evidence of retaliation, the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green* applies. *Laster*, 746 F.3d at 730. Under the first stage of the *McDonnell Douglas* framework, a plaintiff must establish a prima facie case. *Upshaw v. Ford Motor Co.*, 576 F.3d 576 (6th Cir. 2009). If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the employer to produce a "legitimate, nondiscriminatory reason" for the adverse actions alleged. *Laster,* 746 F.3d at 730. If the employer produces such a reason, the burden returns to the plaintiff to show by a preponderance of evidence that the stated reason is "designed to mask retaliation." *Imwalle v. Reliance Med. Prods. Inc.*, 515 F.3d 531, 544 (6th Cir. 2008).

To establish a prima facie case of retaliation, a plaintiff must show: (1) the plaintiff engaged in activity protected by Title VII; (2) the plaintiff's exercise of such protected activity was known by the defendant; (3) afterwards, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action. *Laster*, 746 F.3d at 730. "Title VII retaliation claims 'must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Id.* at 731 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

No. 22-3233, *Freier-Heckler v. McDonough*

First, Dr. Freier-Heckler appears to argue that after Smith reported that Rutledge's conduct towards her was biased, Rutledge retaliated against her by removing her access to his daily calendar on January 3, 2017, and then by asking her to leave a meeting on January 5. But Dr. Freier-Heckler never pointed to Smith's deposition testimony regarding his complaints to management until this appeal. Because she did not raise this evidence before the district court, we need not consider it now. *Cf. Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1012 (6th Cir. 2003).

Second, Dr. Freier-Heckler argues that the VA demoted her in retaliation for her reports of gender discrimination. As to this claim, Dr. Freier-Heckler meets the first three prongs of the prima facie analysis: She made numerous EEOC complaints and HR reports of gender discrimination to the VA, which is clearly protected conduct of which the VA was aware, and she was later demoted, a straightforwardly adverse action. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54 (2006) (a "materially adverse" action in the retaliation context is any action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (quotations omitted)). Whether Dr. Freier-Heckler meets the "causal connection" prong of the prima facie case is less clear. Although she points to the timing of her demotion and argues that the results of the second audit that she performed prompted the VA to demote her, she points to no evidence linking the demotion to her gender discrimination complaints, let alone establishing that those complaints were the "but-for" cause of her demotion. *Laster*, 746 F.3d at 731.

Even if we assume that these claims establish a prima facie retaliation case, Dr. Freier-Heckler fails to show that the Defendants' proffered explanation is pretextual. The Defendants assert that the VA demoted Dr. Freier-Heckler because the AIB's extensive investigation and

report found that she should be removed from a management role, a conclusion that the panel supported with findings that Dr. Freier-Heckler had acted inappropriately towards employees reporting to her by yelling at them, using profanities, and complaining to them about co-supervisors. This is a "legitimate nondiscriminatory reason" that satisfies the VA's burden under *McDonnell Douglas*. The burden therefore shifts back to Dr. Freier-Heckler to show by a preponderance of the evidence that this reason is pretextual. To demonstrate pretext, a plaintiff must "produce evidence sufficient that a reasonable finder of fact could reject the employer's proffered reason." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 777 (6th Cir. 2018) (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007)). A plaintiff may establish pretext by showing that the defendant's stated reasons have no basis in fact, are not the actual reasons, or are insufficient to explain the defendant's actions. *Davis v. Cintas Corp.*, 717 F.3d 476, 491 (6th Cir. 2013).

Dr. Freier-Heckler first argues that the Defendants' stated reason is insufficient to explain the demotion because the AIB recommended only that she receive counseling before managing employees, not that she be demoted. But this claim is contradicted by the record. The AIB also recommended that Dr. Freier-Heckler no longer hold a managerial position and "strongly caution[ed]" the VA against allowing her to continue performing supervisory duties.

Dr. Freier-Heckler also points to evidence that VA executives trusted her to head another sensitive audit after her demotion, which she argues shows a continued confidence in her abilities that was inconsistent with the demotion. But her assignment to an additional audit is not inconsistent with the VA's stated reasons for the demotion. Defendants assert only that they removed Dr. Freier-Heckler from a supervisory position because the AIB determined that she was unfit to supervise employees—they do not contest that she competently performed other aspects

No. 22-3233, *Freier-Heckler v. McDonough*

of her job, particularly audits. Defendants' assertion that the VA demoted Dr. Freier-Heckler only due to her failures as a manager is supported by her later promotion to a nonsupervisory position at the same salary level as the Assistant Logistics Chief position. Accordingly, even if Dr. Freier-Heckler set forth a prima facie case of retaliation, she failed to show that Defendants' stated reason for demoting her was pretextual.

## IV.  CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's decision.